

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**QUILL & ARROW, LLP**
Kevin Y. Jacobson, Esq. (SBN 320532)
kjacobson@quillarrowlaw.com
Aaron Cohen, Esq. (SBN 333008)
acohen@quillarrowlaw.com
e-service@quillarrowlaw.com
10900 Wilshire Boulevard, Suite 300
Los Angeles, CA, 90024
Telephone:   (310) 933-4271
Facsimile:    (310) 889-0645

Attorneys for Plaintiff,
**BEVERLY LUZ COLEMAN**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BEVERLY LUZ COLEMAN, an individual,<br><br>            Plaintiff,<br><br>      vs.<br><br>NISSAN NORTH AMERICA, INC., a Delaware Corporation, and DOES 1 through 10, inclusive,<br><br>            Defendants. | Case No.:<br><br>**COMPLAINT**<br><br>1.  **VIOLATION OF SONG-BEVERLY ACT - BREACH OF EXPRESS WARRANTY**<br><br>2.  **VIOLATION OF SONG-BEVERLY ACT - BREACH OF IMPLIED WARRANTY**<br><br>3.  **VIOLATION OF THE SONG-BEVERLY ACT SECTION 1793.2**<br><br>4.  **FRAUD – FRAUDULENT INDUCEMENT – CONCEALMENT** |

COMPLAINT

Plaintiff, BEVERLY LUZ COLEMAN ("Plaintiff"), an individual, alleges as follows against Defendant, NISSAN NORTH AMERICA, INC., a Delaware Corporation ("NISSAN NORTH AMERICA, INC."), and DOES 1 through 10 inclusive, on information and belief, formed after a reasonable inquiry under the circumstances:

## INTRODUCTION

1.    These causes of action arise out of the warranty obligations of NISSAN NORTH AMERICA, INC.in connection with a vehicle purchased by Plaintiff and for which NISSAN NORTH AMERICA, INC. issued a written warranty.

2.    On December 13, 2018, Plaintiff purchased a 2019 Nissan Sentra, having VIN No.: 3N1AB7APXKY239117 ("the Subject Vehicle"). These causes of action arise out of warranty and repair obligations of NISSAN NORTH AMERICA, INC. in connection with a vehicle that Plaintiff purchased and for which NISSAN NORTH AMERICA, INC. issued a written warranty. The warranty was not issued by the selling dealership.

3.    The Subject Vehicle was delivered to Plaintiff with serious defects and nonconformities to warranty and developed other serious defects and nonconformities to warranty such as , including, but not limited to: defects causing the Subject Vehicle to stall when sitting a stop for less than a minute; defects causing the Forward Emergency Braking ("FEB") system to falsely engage or otherwise not work as intended; defects causing the Subject Vehicle to detect non-existent obstacles, thereby automatically triggering the brakes and causing an abrupt slowdown or complete stop with no actual need to do so; defects causing the FEB system to deactivate itself, thereby distracting the driver and rendering the FEB system disabled and useless; defects causing the Subject Vehicle's dashboard to indicate that there is something in front of the vehicle; defects causing the Subject Vehicle's dashboard to indicate that there is an automatic braking error; defects causing the Subject Vehicle to shake vigorously when approaching a stop; defects

causing the Subject Vehicle's forward collision light to appear on the dashboard when nothing is in front of the vehicle; defects causing the Subject Vehicle to stop without warning during normal and intended vehicle operation; defects causing the Subject Vehicle significant, unexpected, phantom decelerations and stops due to the false engagement of the FEB system, despite no objects—vehicles, pedestrians, or otherwise—were nearby; defects causing the FEB system to frequently deactivate itself; and/or any other defects described in the repair history for the Subject Vehicle (collectively, "Defects"). Said defects substantially impair the use, value, or safety of the Subject Vehicle.

4.    Plaintiff hereby revokes acceptance of the sales contract.

5.    Pursuant to the Song-Beverly Consumer Warranty Act (hereinafter "the Act") Civil Code sections 1790 *et seq*., the Subject Vehicle constitutes a "consumer good" used primarily for family or household purposes, and Plaintiff has used the vehicle primarily for those purposes.

6.    Plaintiff is a "buyer" of consumer goods under the Act.

7.    Defendant NISSAN NORTH AMERICA, INC. is a "manufacturer" and/or "distributor" under the Act.

8.    Plaintiff hereby demands trial by jury in this action.

**Plaintiff's Repair History of the Subject Vehicle**

9.    The following is a summary of some pertinent portions of the repair visits for the Subject Vehicle.

10.    On April 3, 2019, with approximately 5,614 miles on the odometer, Plaintiff presented the Subject Vehicle to Defendant's authorized repair facility, Raceway Nissan, and reported that the Air Conditioning System was not operating as intended when attempting to lower the temperature. Upon inspection, Defendant's authorized technician discovered the air mix ratio to be inaccurate and isolated the air mix actuator as faulty. Defendant's technician replaced the air mix door actuator and presented to Plaintiff that the Air Conditioning System is now operating as

intended. The inspection and repair were performed under the warranty issued by NISSAN OF NORTH AMERICA, INC. The Subject Vehicle was out of service for approximately 1 day during this repair attempt.

11.    On November 1, 2019, with approximately 19,268 miles on the odometer, Plaintiff presented the Subject Vehicle to Defendant's authorized repair facility, Raceway Nissan, once again and reported that the Subject Vehicle would intermittently refuse to start. Plaintiff noted that the Subject Vehicle's power is present, however the starter will refuse to crank. Plaintiff also noticed when the Subject Vehicle is behaving in this manner, the brake lights do not properly illuminate when engaging the brake pedal to start. The brake light switch is a simple spring-loaded switch that activates the brake lights when engaging the brake pedal. The brake light switch is held open by a tab on the brake pedal, keeping the brake lights off. Defendant's authorized technician was able to duplicate Plaintiff's concern and discovered the brake light switch to be intermittently fixed in place, keeping the brake lights off. Furthermore, a short-circuiting Brake Light Switch can cause the brake lamp or bulb to burn out sooner and drain the Nissan's battery, leaving you with a non-starting vehicle[1]. Defendant's authorized technician removed the defective component and replaced the brake light switch to remedy Plaintiff's concern. Plaintiff continued to state that the Subject Vehicle's Radio volume acts erratic and fluctuates when adjusted. Defendant's technician performed a reconfiguration on the infotainment system according to the campaign to address the volume issue. Additionally, Plaintiff reported that the tire pressure monitoring system ("TPMS") light was illuminated on the Subject Vehicle's dashboard. Defendant's technician discovered the tire pressure sensor contained an internal failure of the

---

[1] According to the official Nissan of North America, Inc. website, malfunctioning brake lights can put the driver at potential risk of a car accident. When the brake lights become compromised or disconnected, it may not illuminate when pressing down the pedal. NISSAN NORTH AMERICA, INC., 2019 Nissan Sentra Brake Light Switch-25320-BR00A-Genuine Nissan Part, available at https://parts.nissanusa.com/p/Nissan_2019_Sentra/Brake-Light-Switch/89555970/25320-BR00A.html

sensor and thus indicating an inaccurate reading. After Defendant's technician removed the faulty component and replaced the front right tire pressure sensor, they presented to Plaintiff that the issue had been resolved. Despite the alleged repairs, Plaintiff's electrical concerns have persisted throughout their ownership. The inspection and repairs were performed under the warranty issued by NISSAN OF NORTH AMERICA, INC. The Subject Vehicle was out of service for approximately 1 day during this repair attempt.

12.    On February 12, 2020, with approximately 26,439 miles on the odometer, Plaintiff presented the Subject Vehicle to Defendant's authorized repair facility, Raceway Nissan, and reported that the Air Conditioning system does not operate as intended. Plaintiff further described that unless the temperature is positioned at 60 degrees, the Air Conditioning system would not release cool air. Any higher would cause the Air Conditioning system to emit warm/hot air. Upon inspection, Defendant's authorized technician claimed that they were unable to duplicate Plaintiff's concern and reported that the Air Conditioning system to be operating as intended. Although the Defendant's technician presented to Plaintiff that the Subject Vehicle did not possess any nonconformities, Plaintiff's concern has persisted throughout their ownership of the Subject Vehicle. The inspection was performed under the warranty issued by NISSAN OF NORTH AMERICA, INC. The Subject Vehicle was out of service for approximately 1 day during this repair attempt.

13.    On April 14, 2020, with approximately 29,336 miles on the odometer, Plaintiff presented the Subject Vehicle to Defendant's authorized repair facility, Raceway Nissan, and reported that the Radio unit's volume is now inoperative. Plaintiff noted that the Radio unit acts erratic, and the volume will occasionally fluctuate. Defendant's authorized technician was able to duplicate the issue of the Audio Unit's volume knobs being irresponsive when adjusting the volume either up or down. Thus, Defendant's technician removed and replaced the defective Audio Unit Assembly, performed an Audo Unit configuration, then presented to Plaintiff

that the issue had been resolved. Plaintiff also stated that the Driver's side Headlight Bulb was inoperative. Upon inspection, Defendant's technician discovered the Headlight Bulb to possess an internal open circuit, causing the malfunction. Defendant's technician accordingly removed and replaced the defective Front Headlight bulb, and then presented to Plaintiff that the concern had been resolved. Furthermore, Plaintiff also complained of the Front Pre-Collision Warning system falsely activating although there being no other obstructions in the Subject Vehicle's vicinity. Plaintiff further notes that the Pre-Collision Warning system falsely activating, creates an untrustworthy and dangerous driving experience. Upon inspection, Defendant's technician discovered the date of the distance sensor to read August 8, 2018. As per the bulletin, the Defendant's technician replaced the defective sensor and performed a distance sensor alignment to compensate for any malfunctions. After the repairs, Defendant's technician reported the Subject Vehicle to be operating as intended. Although the Defendant's technician presented to Plaintiff that the Subject Vehicle did not possess any nonconformities, Plaintiff's concern has persisted throughout their ownership of the Subject Vehicle. The inspection was performed under the warranty issued by NISSAN OF NORTH AMERICA, INC. The Subject Vehicle was out of service for approximately 1 day during this repair attempt.

14.    On April 19, 2022, with approximately 73,995 miles on the odometer, Plaintiff presented the Subject Vehicle to Defendant's authorized repair facility, Raceway Nissan, and reported the Subject Vehicle not being able to start. Defendant's authorized technician performed a battery test on the Subject Vehicle and verified Plaintiff's issue. Upon further inspection, the battery failed the loading test and Defendant's technician discovered a broken positive terminal causing the Subject Vehicle to not be able to start. To remedy Plaintiff's issue, Defendant's technician proceeded to replace the defective battery and terminal. Although the Defendant's technician presented to Plaintiff that the Subject Vehicle did not possess

any nonconformities, Plaintiff's concerns have persisted throughout their ownership of the Subject Vehicle. The inspection was performed under the warranty issued by NISSAN OF NORTH AMERICA, INC. The Subject Vehicle was out of service for approximately 1 day during this repair attempt.

15.    None of the aforementioned repair attempts successfully repaired the Subject Vehicle, including its ongoing defects.

16.    Thereafter, Plaintiff continued to experience symptoms of the various defects despite Defendant's representation that the Subject Vehicle was repaired.

17.    Defendant was under an affirmative duty under the Song-Beverly Consumer Warranty Act to promptly offer to repurchase or replace the Subject Vehicle as soon as it failed to conform the Subject Vehicle to the terms of the express warranty after a reasonable number of repair attempts.

18.    Despite having no obligation to do so, prior to filing this lawsuit, Plaintiff contacted Defendant NISSAN OF NORTH AMERICA, INC. directly and requested a repurchase of the Subject Vehicle due to the ongoing issues that Defendant and its authorized repair facilities could not repair to conform the vehicle to the terms of its written warranties within a reasonable number of repair opportunities. Defendant denied Plaintiff's request.[2]

### **Defendant's Knowledge of, and Failure to Disclose, the FEB Defect**

19.    In 2017, NISSAN NORTH AMERICA, INC. began offering the feature known as Forward Emergency Braking ("FEB") as an option on the various Nissan models. For example, FEB was available as a part of the $2,020 "SL Premium Package" option on the 2017 Nissan Rogue SL.

20.    As demonstrated below, the FEB system utilizes a radar and/or camera system that measures the distance between the vehicle and its surrounding objects. If

---

[2] "A manufacturer's duty to replace a vehicle does not depend on a consumer's request, but instead arises as soon as the manufacturer fails to comply with the warranty within a reasonable time. *Krotin v. Porsche Cars North America, Inc.*, 38 Cal.App.4th 294, 301-302 (1995). *Krotin* court noted that "[a]n automobile manufacturer need not read minds to determine which vehicles are defective; it need only read dealers' services records." *Id.* at 303.

the FEB system detects a rapid decrease in distance between the vehicle and an object accompanied with no driver responsive inputs, the FEB system "provide[s] audible and visual alerts and appl[ies] braking to help you avoid or mitigate a frontal collision with a vehicle ahead."



21.    However, NISSAN NORTH AMERICA, INC. under-designed, engineered, tested, and validated the FEB system. The FEB Defect, among other things, causes: (1) the Subject Vehicle to detect non-existent obstacles, triggering a braking response and causing the Subject Vehicle to abruptly decelerate or stop completely despite no need for this action, and/or (2) the FEB system to deactivate itself, thereby distracting the driver and rendering the FEB system unavailable and useless. The FEB Defect presents a safety hazard that distracts Plaintiff and renders the Subject Vehicle unreasonably dangerous to consumers as it severely impacts a driver's ability to control the vehicle's speed as expected under normal driving conditions and maintain an appropriate speed based on traffic flow, thereby increasing the risk of a rear-end collision.

22.    NISSAN NORTH AMERICA, INC. knew about the problem of false activations in its FEB systems years before it put the first vehicle on the market. NISSAN NORTH AMERICA, INC. became aware of the FEB Defect through sources not available to Plaintiff, including, but not limited to: pre-production testing, pre-production design failure mode and analysis data, production design failure mode and analysis data, early consumer complaints made exclusively to NISSAN NORTH

AMERICA, INC.'s network of dealers and directly to NISSAN NORTH AMERICA, INC., aggregate warranty data compiled from NISSAN NORTH AMERICA, INC.'s network of dealers, testing conducted by NISSAN NORTH AMERICA, INC. in response to consumer complaints, and repair order and parts data received by NISSAN NORTH AMERICA, INC. from NISSAN NORTH AMERICA, INC.'s network of dealers and suppliers, including Bosch and Continental.

23.    In addition, NISSAN NORTH AMERICA, INC. and other members of the automotive industry knew that as a new and not fully developed technology, automatic braking systems like FEB were prone to false activations. NISSAN NORTH AMERICA, INC. manufactured and sold the Subject Vehicle equipped with this technology anyway.

24.    As further evidence of NISSAN NORTH AMERICA, INC.'s pre-sale knowledge, the owner's manuals for the earliest vehicles alluded to the risk of false activations by stating "in some road or traffic conditions, the FEB system may unexpectedly apply partial braking." This warning about the FEB system was buried in small text in the middle of owner's manuals, which are several hundred pages long. Notwithstanding the FEB system being touted as a safety feature, NISSAN NORTH AMERICA, INC. never referenced or otherwise directed potential purchasers to this hidden disclaimer. As such, Plaintiff would only see this disclosure, if at all, after purchasing or leasing the vehicle, and if he happened to stumble upon it when reading the owner's manual. Even then, however, the disclosure is too vague, cursory, and non-specific to adequately warn anyone about the true scope and extent of the dangers of the FEB Defect.

25.    NISSAN NORTH AMERICA, INC. also began receiving an unusually large number of complaints about false activations almost immediately after the earliest vehicle entered the market. Nonetheless, NISSAN NORTH AMERICA, INC. continued to sell the vehicle and continued to install the Continental ARS-410 radar in newer model-year vehicles.

26.     NISSAN NORTH AMERICA, INC. had, and continues to have, a duty to fully disclose to Plaintiff the true nature of the FEB Defect, because, among other reasons, the Defect poses an unreasonable safety hazard; because NISSAN NORTH AMERICA, INC. had and has exclusive knowledge or access to material facts about the vehicle's FEB systems that were not and are not known to, or reasonably discoverable by Plaintiff; and because NISSAN NORTH AMERICA, INC. has actively concealed the FEB Defect from Plaintiff at the time of purchase or repair and thereafter.

27.     Specifically, NISSAN NORTH AMERICA, INC.: (a) failed to disclose, at the time of purchase or repair and thereafter, any and all known material defects or material nonconformities of the Subject Vehicle, including the FEB Defect; (b) failed to disclose, at the time of purchase or repair and thereafter, that the Subject Vehicle and the FEB systems were not in good working order, were defective and prone to failure, and were not fit for the intended purpose; and (c) failed to disclose and/or actively concealed the fact that the Subject Vehicle and the FEB system was defective, despite the fact that NISSAN NORTH AMERICA, INC. learned of the FEB Defect before it placed the Subject Vehicle in the stream of commerce.

28.     On June 8, 2018, NISSAN NORTH AMERICA, INC. released TSB NTB18-041 concerning the "Unexpected Operation of AEB, FEB OR FCW [Forward Collision Warning]" in 2018 Rogue, Rogue Hybrid, and Rogue Sport vehicles. The TSB stated that "The following system(s) operate unexpectedly or the customer reports unexpected operation: AEB (Automatic Emergency Braking); FEB (Forward Emergency Braking); FCW (Forward Collision Warning). On July 19, 2018, Nissan released an amended TSB NTB18-041a, updated to include 2017-18 Rogue, Rogue Hybrid, and Rogue Sport vehicles. Neither of these TSB67s prevented false activations from occurring, and Nissan continued to receive complaints about false activations after issuing these TSBs.

29.     Since mid-2018, NISSAN NORTH AMERICA, INC. has issued

approximately 11 different TSBs, quality actions, or other service campaigns directed at eliminating false activations in the Subject Vehicle. To this day, NISSAN NORTH AMERICA, INC. still has not found a solution to false activations.

30.     On January 25, 2019, NISSAN NORTH AMERICA, INC. released NPSB18-443 AEB U – "Automatic Emergency Braking (AEB) Update Notification Letter" – related to the 2017-2018 Nissan Rogue and Rogue Sport. In this bulletin, NISSAN NORTH AMERICA, INC. stated "[i]n rare instances and unique roadway environments such as certain types of railroad crossings and metal overpasses, the AEB system in some vehicles may activate braking when not needed." However, the statement that false activations only occurred in "rare instances and unique roadway environments" was false, and NISSAN NORTH AMERICA, INC. knew that the statement was false. Drivers were experiencing false activations in ordinary and common driving scenarios, like two-lane streets, highways, and parking garages.

31.     As the Center for Auto Safety ("CAS") explained on March 21, 2019, this "'Customer Service Initiative' intended to 'increase awareness of an available update for the Automatic Emergency Braking (AEB) system.' Presumably, this update is the repair outlined in the July 2018 TSB. … [However,] the summary portion available suggests that Nissan's communication to Rogue owners does not acknowledge the potential safety issue involved. The language treats the problem as no more than a performance update, thus providing little incentive for consumers to avail themselves of the repair opportunity until they experience the problem."[3]

32.     Federal law requires automakers like NISSAN NORTH AMERICA, INC. to notify (and update) the National Highway Traffic Safety Administration of potential defects. *See* TREAD Act, Pub. L. No. 106- 414, 114 Stat. 1800 (2000). Accordingly, NISSAN NORTH AMERICA, INC. should (and does) monitor the

---

[3]  The Center for Auto Safety, Petition for Defect Investigation (Mar. 21, 2019), https://www.autosafety.org/wp-content/uploads/2019/03/Center-for-Auto-Safety-Nissan-Rogue-AEB-Defect-Petition-FINAL.pdf (last visited May 7, 2020). On March 21, 2019, CAS submitted a petition to NHTSA to "initiate a Defect Investigation into false activation of the emergency braking system that is placing Rogue owners and other road users in danger." *Id.*

NHTSA database to track reports of defective FEB systems. From this source, NISSAN NORTH AMERICA, INC. knew that the Subject Vehicle was experiencing unusually high levels of false engagements causing abrupt slowdowns, stops, or deactivations.

33.    As CAS explains, it "found 87 such complaints in NHTSA's VOQ data for the 2017-18 Rogue. All of these complaints indicate that the Rogue's [FEB] engaged when no obstruction was in the path of the vehicle. Many complaints indicate that braking is abrupt or forceful, endangering both the Rogue occupants as well as people in vehicles nearby, who are forced to avoid a collision with a suddenly stopped vehicle."[4]

34.    Additionally, in early 2019, NISSAN NORTH AMERICA, INC. issued a Notice of Defect for 91,000 affected Rogue vehicles from the 2017 and 2018 model years "because their automatic emergency braking (AEB) system could unintentionally engage."[5] Despite acknowledging this dangerous defect to Transport Canada, NHTSA's Canadian counterpart, NISSAN NORTH AMERICA, INC. has made no such efforts to recall any of its AEB-equipped vehicles in the United States, even though there are no differences between the Rogues that NISSAN NORTH AMERICA, INC. sells to Canadian consumers and those it sells to American consumers. Instead, it continued to equip Rogue and other Nissan-brand cars with the ARS410 radar.

35.    In addition, in 2020, NISSAN NORTH AMERICA, INC. issued a recall for its X-Trail crossover SUV in Asia, which uses the same platform as the Nissan Rogue in the United States and Canada. As reported by one news agency in Asia, "[a]ccording to Nissan, these vehicles are fitted with a radar system made by Continental. The affected radar model, ARS410 may activate especially when the

---

[4] *Id.*
[5] Nissan Canada recalls 90,000 Rogues over unintended braking, AUTOMOTIVE NEWS CANADA, April 12, 2019, available at https://canada.autonews.com/automakers/nissan-canada-recalls-90000-rogues-over-unintended-braking.

XTrailmaneuvers around ....bridges, parking garages, low-hanging traffic lights, and even steep incline roads." At that time, NISSAN NORTH AMERICA, INC. suggested turning off the FEB system to avoid false activations until a software update could be installed. However, to date, NISSAN NORTH AMERICA, INC. still has not developed a software update that eliminates false activations.

36. The following example complaints filed by consumers with NHTSA and posted on the Internet demonstrate that the FEB Defect is a widespread safety hazard that continues to plague the Subject Vehicle. The complaints below are examples only, and do not represent the universe of complaints that NISSAN NORTH AMERICA, INC. has received. The number of complaints that NISSAN NORTH AMERICA, INC. received was unusually high, which put NISSAN NORTH AMERICA, INC. on further notice of the FEB Defect.

37. The following is an example of a Complaint regarding the FEB Defect:

**Dec 31, 2017 - Vacaville, CA - Forward Collision Avoidance**
THIS VEHICLE WAS PURCHASED NEW FROM THE DEALERSHIP, NISSAN OF VACAVILLE, ON 9-16-2017. ON 10-26-2017 WHILE TRAVELING AT APPROXIMATELY 35 MPH THE VEHICLE'S FORWARD EMERGENCY BRAKING SYSTEM (FEB) SUDDENLY AND UNEXPECTEDLY ACTIVATED, BRING THE CAR TO A FULL AND COMPLETE STOP IN THE MIDDLE OF THE ROAD. THE BRAKING SYSTEM DISENGAGED WITHIN A FEW SECONDS AND I WAS ABLE TO PULL TO THE SIDE OF THE ROAD. THERE WERE NO ADVERSE CONDITIONS, OBSTRUCTIONS, OR VEHICLES WITHIN A DANGEROUS DISTANCE TO HAVE CAUSED THE ACTIVATION. THE DASHBOARD WARNING LIGHTS DISPLAYED THE ALERT MESSAGE "WARNING" "MALFUNCTION." THE VEHICLE WAS SUBSEQUENTLY TOWED TO AUTOCOM NISSAN OF CONCORD FOR SERVICE AND DIAGNOSIS. I WAS TOLD CODES U1002, C1B5D, AND C1A16-97 WERE STORED IN THE COMPUTER SYSTEM. C1A16-97 RELATES TO AN OBSTRUCTION OR BLOCKED RADAR SENSOR, BUT THAT ALL THE STORED CODES WERE IN THE PAST. C1A16-97 WAS STORED AT 1983 MILES - I EXPERIENCED NO ACTIVATION OF THE

SYSTEM AT THAT TIME. ACCORDING TO THE DEALERSHIP THERE WERE NO STORED CODES RELATED TO TODAY'S INCIDENT. NISSAN TECH LINE MADE A REMOTE DIAGNOSIS AND CONCLUDED A LOOSE LICENSE PLATE FRAME LIKELY HAD CAUSED AND OBSTRUCTION, ACTIVATING THE SYSTEM. THIS IS IN CONFLICT WITH THE OWNERS MANUAL'S EXPLANATION OF FEB SHUT DOWN IN THE EVENT OF AN OBSTRUCTION. ON 12-19-2017 I RETURNED THE VEHICLE TO THE DEALERSHIP WHERE I PURCHASED THE CAR. AFTER FOUR DAYS OF DIAGNOSTIC AND ROAD TESTING I WAS TOLD THAT, ACCORDING TO NISSAN TECH LINE, SINCE THE DEALERSHIP WAS UNABLE TO DUPLICATE THE MALFUNCTION DURING THE TEST DRIVE, THEN THE CAR IS CONSIDERED OPERATIONAL AND SAFE AND COULD BE RETURNED TO THE CUSTOMER. AND ALTHOUGH FINDING MULTIPLE PAST CODES STORED ECM-UL00L, ASB-UL002, BCM UL000-00, UL000-01, CLB40-49, CLB30-49, UL000-00, ICC /ADAS-C1B53-04, CLB54-00, UL000-01 ALL INDICATION MALFUNCTION. NONE OF WHICH HAVE BEEN RESOLVED OR REPAIRED. ## VIN PASSED ## NISSAN ROUGE S FWD 2017.5 ##

38.    The above complaint represents only a sampling of otherwise voluminous complaints regarding the FEB Defect that consumers have reported to NISSAN NORTH AMERICA, INC. directly and through its dealers.

39.    NISSAN NORTH AMERICA, INC. knew that the FEB Defect was present in the Subject Vehicle equipped with the FEB system, as demonstrated above, but it failed to remedy the defect. NISSAN NORTH AMERICA, INC.'s halfhearted and unconscionable acts have deprived and continue to deprive Plaintiff of the benefit of his bargain. Had Plaintiff known about the FEB Defect, he would not have purchased the Subject Vehicle, or certainly would have paid less to do so.

40.    NISSAN NORTH AMERICA, INC.'s overarching marketing message for the Subject Vehicle, and specifically the FEB System, was and is that the FEB System creates a safe and reliable vehicle. This marketing message is false and misleading given the FEB Defect, which distracts consumers and can cause the

Subject Vehicle to suddenly and unexpectedly stop in the middle of the road.

41. For example, Nissan dedicates a page on its website for the Nissan Safety Shield 360, touting "[a]ll-around protection" and, specifically, the FEB System:" 3F[6]





[6] https://www.nissanusa.com/safety-shield.html (last visited Jun 19, 2022)

# NISSAN SAFETY SHIELD CONCEPT



These technologies monitor vehicle systems and the outside driving environment.

**Vehicle Dynamic Control [*]**

If VDC detects sudden over or under steer, it reduces engine power and/or applies brake pressure to individual wheels to help keep you on your steered path.

**Traction Control System**

TCS can sense drive-wheel spin and respond by reducing throttle or applying brake pressure to help maintain traction.

**Anti-lock Braking System**

In panic-braking situations the ABS rapidly pumps the brakes, helping prevent wheel lockup and helping you maintain steering control.

**Electronic Brake Force Distribution**

The EBD system sends extra force to the rear brakes when it senses additional weight in the back.

## 1. Monitor

Nissan is committed to its position as a leader in the world of automotive safety. This dedication to comprehensive safety goes into the engineering and design of every vehicle we make, and it drives the development of the Nissan Safety Shield technologies.

The Safety Shield Technologies Operate During Three Basic Phases:



**Tire Pressure Monitoring System [*]**

Using an icon on your Nissan's dash, TPMS warns you when tires aren't properly inflated.

**Lane Departure Warning [*]**

If you unintentionally stray from your lane, this system lets you know with audio and visual alerts.

**Blind Spot Warning [*]**

Indicators illuminate when the system detects a vehicle in your blind spot, and the system chimes a warning if the turn signal is activated.

**RearView Monitor [*]**

When backing-up, the RearView Monitor helps you see what's directly behind you.

**Moving Object Detection [*]**

Indicators illuminate when the system detects a vehicle in your blind spot, and the system chimes a warning if the turn signal is activated.

## 2. Respond

These technologies help you respond to potentially harmful situation.

**Around View® Monitor [*]**

This feature creates a bird's-eye view of your Nissan and displays it on the LCD monitor, so parking and backing-up are both safer and easier.





42.    That NISSAN NORTH AMERICA, INC. touted the safety and reliability of the Subject Vehicle and the FEB system while knowing of the FEB Defect and its gross underperformance, is unfair and unconscionable.

43.    Although NISSAN NORTH AMERICA, INC. was aware of the widespread nature of the FEB Defect in the Subject Vehicle, and that it posed grave safety risks, NISSAN NORTH AMERICA, INC. failed to take adequate steps to notify Plaintiff of the FEB Defect and provide relief.

44.    NISSAN NORTH AMERICA, INC. has not recalled the Subject Vehicle to repair the FEB Defect and has downplayed the severity of the FEB Defect in service campaigns. It has not offered Plaintiff a suitable repair or replacement of

parts related to the FEB Defect free of charge, or offered to reimburse Plaintiff for costs incurred for repairs related to the FEB Defect.

45.    Plaintiff has not received the value for which he bargained when he purchased the Subject Vehicle.

46.    NISSAN NORTH AMERICA, INC. has deprived Plaintiff of the benefit of his bargain, exposed him to a dangerous safety defect without any notice, and failed to repair or otherwise remedy the FEB Defect contained in Subject Vehicle. As a result of the FEB Defect, the Subject Vehicle's value has diminished, including without limitation, the vehicle's resale value. Reasonable consumers, like Plaintiff, expect and assume that a vehicle's FEB system and related components are not defective, and will not malfunction while operating the vehicle as it is intended to be operated, and thus did not receive the benefit of their bargain, i.e., the price premium they paid attributable to the FEB system.

47.    Plaintiff further expects and assumes that NISSAN NORTH AMERICA, INC. will not sell or lease vehicles with known safety defects, such as the FEB Defect, and will fully disclose any such defect to consumers prior to purchase, or offer a suitable, non-defective repair.

48.    NISSAN NORTH AMERICA, INC. had extensive and exclusive notice of the FEB Defect, as detailed above. Additionally, given NISSAN NORTH AMERICA, INC.'s extensive and exclusive knowledge of the FEB Defect, its latency, and NISSAN NORTH AMERICA, INC.'s inability to repair it, any notice requirement would be futile.

49.    However, NISSAN NORTH AMERICA, INC. wrongfully and intentionally concealed, and continues to conceal, from the lease and/or pre-purchase transaction to the present day, one or more defects in the Subject Vehicle's FEB system that can cause it to falsely engage or otherwise not work as intended ("FEB Defect"). The FEB Defect causes, among other things: (1) the Subject Vehicle to detect non-existent obstacles, thereby automatically triggering the brakes and causing

the Subject Vehicle to abruptly slow down or completely stop with no actual need to do so; and/or (2) the FEB system to deactivate itself, thereby distracting the driver and rendering the FEB system disabled and useless. In either scenario, however, the FEB system is not a safety feature, as NISSAN NORTH AMERICA, INC. claimed, but rather an unpredictable and unreasonable safety hazard.

50.    The FEB Defect can cause the Subject Vehicle to stop without warning during normal and intended vehicle operation, thereby posing an unreasonable safety hazard to drivers, passengers, other motorists, and pedestrians. Plaintiff has reported significant, unexpected, phantom decelerations and stops due to the false engagement of the Subject Vehicle's FEB system, even though no objects – vehicles, pedestrians, or otherwise – were nearby. Additionally, Plaintiff has complained that the FEB system also frequently deactivates itself, detracting his focus from the road and rending the FEB safety feature useless.

51.    NISSAN NORTH AMERICA, INC. marketed, and continues to market, the Subject Vehicle, and the FEB system specifically, as safe and reliable. NISSAN NORTH AMERICA, INC., however, failed to disclose the FEB Defect to Plaintiff, despite its knowledge that the Subject Vehicle was defective and not fit for the intended purpose of providing Plaintiff with a safe and reliable transportation at the time of sale and thereafter. NISSAN NORTH AMERICA, INC. has actively concealed, and continues to conceal from Plaintiff the true nature and extent of the FEB Defect after failing to disclose it at the time of purchase, lease, or repair. Had Plaintiff known about the FEB Defect, he would not have purchased the Subject Vehicle, or would have paid less for the Subject Vehicle. As a result of his reliance on NISSAN NORTH AMERICA, INC.'s concealment/omissions, and its active concealment, Plaintiff has suffered an ascertainable loss of money, property, and/or loss in value of the Subject Vehicle.

52.    Despite notice of the FEB Defect from, among other things, pre-production testing, consumer complaints, warranty data, and dealership repair orders,

NISSAN NORTH AMERICA, INC. has not recalled the Subject Vehicle to repair the FEB Defect, has not offered Plaintiff a suitable repair or replacement free of charge, and has not offered to reimburse Plaintiff for costs incurred relating to diagnosing and repairing the FEB Defect, or for the value paid for the FEB feature in the first place. NISSAN NORTH AMERICA, INC. has refused to repair or replace the Subject Vehicle despite that the Subject Vehicle is under a comprehensive warranty, as explained in detail below. Thus, NISSAN NORTH AMERICA, INC. has wrongfully and intentionally transferred the cost of repair of the FEB Defect to Plaintiff by fraudulently concealing the existence of the FEB Defect.

53.   Under the warranties provided to Plaintiff, NISSAN NORTH AMERICA, INC. promised to repair or replace defective FEB components arising out of defects in materials and/or workmanship, such as the FEB Defect, at no cost to owners or lessors of the Subject Vehicle. For illustrative purposes, NISSAN NORTH AMERICA, INC. offers a 36-month or 36,000-mile Basic Warranty that "covers any repairs needed to correct d effects in materials or workmanship of all parts and components of each new Nissan vehicle supplied by Nissan."

54.   NISSAN NORTH AMERICA, INC. breached its express and implied warranties through which it promised, *inter alia*: (1) to provide a Subject Vehicle fit for the ordinary purpose for which it was sold; and (2) to repair and correct manufacturing defects or defects in materials or workmanship of any parts that it supplied, including in the FEB System. Because the FEB Defects was present at the time of sale or lease of the Subject Vehicle, NISSAN NORTH AMERICA, INC. is required to repair or replace the Subject Vehicle pursuant to the terms of the warranty. Instead, NISSAN NORTH AMERICA, INC. has wrongfully shifted to Plaintiff the cost of repair of the FEB Defect, or replacing the Subject Vehicle. These costs are significant, and unexpected by reasonable consumers.

55.   NISSAN NORTH AMERICA, INC. and its network of authorized dealers possess exclusive and superior knowledge and information regarding the FEB

Defect. Despite this, NISSAN NORTH AMERICA, INC. has failed to notify Plaintiff of the FEB Defect, who could not have reasonably discovered the defect through due diligence. Similarly, NISSAN NORTH AMERICA, INC. has failed to provide Plaintiff with any remedy for the FEB Defect, despite voluminous customer complaints.

56.    While promoting the standard, quality, and/or grade of the Subject Vehicle, NISSAN NORTH AMERICA, INC. knowingly concealed/omitted, and actively conceals, the existence of the FEB Defect at the time of purchase or lease or otherwise to increase its profits and decrease its costs (by selling additional defective vehicles and transferring to Plaintiff the cost of the repair of the FEB Defect or replacement of the vehicle).

57.    NISSAN NORTH AMERICA, INC. knowingly omitted, concealed, and suppressed material facts regarding the FEB Defect, and misrepresented the standard, quality, or grade of the Subject Vehicle, all at the time of purchase or lease or otherwise, which directly caused harm to Plaintiff. As a direct result of NISSAN NORTH AMERICA, INC.'s wrongful conduct, Plaintiff has suffered damages, including, *inter alia*: (1) out-of-pocket expenses for repair of the FEB Defect; (2) costs for future repairs or replacements; (3) the sale of the vehicle at a loss; (4) the diminished value of the vehicle; and/or (5) the price premium attributable to the FEB feature.

58.    Plaintiff therefore asserts claims against NISSAN NORTH AMERICA, INC. for fraud, breach of express and implied warranties, and Violation of the Song-Beverly Act Section 1793.2. As alleged herein, NISSAN NORTH AMERICA, INC.'s wrongful conduct has harmed Plaintiff. As such, Plaintiff is entitled to damages.

59.    Plaintiff hereby revokes acceptance of the sales contract.

60.    Pursuant to the Song-Beverly Consumer Warranty Act (hereinafter the "Act") Civil Code sections 1790 *et seq.*, the Subject Vehicle constitutes a "consumer

good" used primarily for family or household purposes, and Plaintiff has used the vehicle primarily for those purposes.

61.    Plaintiff is a "buyer" of consumer goods under the Act.

62.    Defendant, NISSAN NORTH AMERICA, INC., is a "manufacturer" and/or "distributor" under the Act.

63.    Plaintiff hereby demands trial by jury in this action.

## TOLLING OF THE STATUE OF LIMITATIONS

64.    To the extent there are any statutes of limitation applicable to Plaintiff's claims—including, without limitation, the express warranty, implied warranty, and fraudulent omissions claims—the running of the limitations periods has been tolled by the following doctrines of rules: equitable tolling, the discovery rule, the fraudulent concealment rule, equitable estoppel, the repair doctrine, and/or class action tolling (*e.g.*, the *American Pipe* rule) arising from the pendency of the *Bereda, et al. v. Nissan North America, Inc*. matter (USDC Middle District of Tennessee, 3:22-cv-00098).

65.    Plaintiff had no way of knowing about Defendant's deception regarding the Automatic Emergency Braking and Forward Collision Warning Systems defect until the manifestation of the defect manifested and Defendant was unable to repair it after a reasonable number of repair opportunities.

66.    Plaintiff could not have discovered, through exercising reasonable diligence, that Defendant was concealing the Automatic Emergency Braking and Forward Collision Warning Systems defect and Defendant's conduct alleged herein within the time period of any applicable statutes of limitation.

67.    Plaintiff did not discover the facts that would have caused a reasonable person to suspect that Defendant had concealed information about the Automatic Emergency Braking and Forward Collision Warning Systems Defect in Nissan vehicles until shortly before this action was filed.

68.    Defendant owed a continuous duty to disclose to Plaintiff the accurate

character, quality, and nature of Nissan vehicles suffering from the Emergency Brake Defect, and the inescapable repairs, costs, and damages resulting from the Emergency Brake Defect.

69.    The status of limitations is tolled by various unsuccessful attempts to repair the Subject Vehicle.

## JURISDICTION AND VENUE

70.    This Court has jurisdiction over the subject matter and parties pursuant to 28 U.S.C. § 1332 *et seq*., because the amount of recovery sought by Plaintiff exceeds the jurisdictional amount of $75,000.00, and there is complete diversity among the parties.

71.    The Subject Vehicle, as reflected in the sales contract, has an approximate value of $ 30,287.88.  Pursuant to the Song-Beverly Act, Plaintiff is seeking general, special, and actual damages, as well as civil penalties, up to two times the amount of actual damage. As such, Plaintiff seeks in the approximate amount of $ 90,863.64. Plaintiff is also seeking reasonable attorneys' fees under the Act. Accordingly, Plaintiff's claims meet the jurisdictional threshold required under 28 U.S.C. § 1332 (a).

72.    Complete diversity exists as Plaintiff, BEVERLY LUZ COLEMAN, is a citizen of the state of California.

73.    Defendant, NISSAN NORTH AMERICA, INC., is a Delaware corporation operating and doing business in the state of California. As reflected within Defendant's Statement of Information filed with the California Secretary of State, NISSAN NORTH AMERICA, INC. is incorporated and has its principal place of business in the State of Delaware. A true and correct copy of Defendant, NISSAN NORTH AMERICA, INC.'s Statement of Information filed with the California Secretary of State on November 1, 2021, is attached herewith as **Exhibit A**.

74.    As such, the Defendant is not incorporated in California but in Delaware. Accordingly, there is complete diversity among the parties under 28

U.S.C. § 1332 (a) (1), and Plaintiff has now alleged sufficient facts to establish subject matter jurisdiction.[7]

75.    Venue is proper in, and Defendants are subject to the personal jurisdiction of this Court because the Subject Vehicle was purchased at Nissan of Alhambra, a NISSAN NORTH AMERICA, INC. authorized dealership and repair facility, located at 1811 W. Main Street, Alhambra, CA 91801.

76.    Venue is also proper, as Plaintiff, BEVERLY LUZ COLEMAN, is an individual residing in the city of Los Angeles, in the state of California.

77.    All acts of corporate employees as alleged were authorized or ratified by an officer, director, or managing agent of the corporate employer.

78.    Each Defendant, whether actually or fictitiously named herein, was the principal, agent (actual or ostensible), or employee of each other Defendant, and in acting as such principal or within the course and scope of such employment or agency, took some part in the acts and omissions hereinafter set forth by reason of which each Defendant is liable to Plaintiff for the relief prayed for herein.

## DEMAND FOR JURY TRIAL

79.    Plaintiff, BEVERLY LUZ COLEMAN, hereby demands trial by jury in this action.

## FIRST CAUSE OF ACTION

### Violation of the Song-Beverly Act – Breach of Express Warranty

80.    Plaintiff incorporates herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

---

[7] The Federal Rules are designed to minimize disputes over pleading technicalities. *See Ashcroft v. Iqbal*, 556 US 662, 678 (2009). A complaint is sufficient if it gives the defendant "fair notice of what the … claim is and the grounds upon which it rests." *Bell Atlantic Corporation et al. v. Twombly*, 550 U.S. 544, at 555 (2007); see *Starr v. Baca*, 652 F3d 1202, 1212 (9th Cir. 2011) (discussing traditional liberal theory of Rule 8(a)). In determining the sufficiency of a pleading, allegations of material fact are taken as true and construed in the light most favorable to the pleader. *See Erickson v. Pardus*, 551 US 89, 94 (2007) (emphasis added); *see also Silvas v. E*Trade Mortg. Corp.*, 514 F.3d 1001 (9th Cir. 2008*); accord Proft v. Raoul*, 944 F3d 686, 690 (7th Cir. 2019).

81.    These causes of action arise out of warranty and repair obligations of NISSAN NORTH AMERICA, INC. in connection with a vehicle that Plaintiff purchased and for which NISSAN NORTH AMERICA, INC. issued a written warranty. The warranty was not issued by the selling dealership.

82.    The Subject Vehicle was delivered to Plaintiff with serious defects and nonconformities to warranty and developed other serious defects and nonconformities to warranty including, but not limited to, electrical, structural, engine, transmission, and emission system defects.

83.    Pursuant to the Song-Beverly Consumer Warranty Act (herein after the "Act") Civil Code sections 1790 *et seq.*, the Subject Vehicle constitutes a "consumer good" used primarily for family or household purposes, and Plaintiff has used the vehicle primarily for those purposes.

84.    Plaintiff is a "buyer" of consumers goods under the Act.

85.    Defendant NISSAN NORTH AMERICA, INC. is a "manufacturer" and/or "distributor" under the Act.

86.    The foregoing defects and nonconformities to warranty manifested themselves in the Subject Vehicle within the applicable express warranty period. The nonconformities substantially impair the vehicle's use, value, and/or safety.

87.    Plaintiff delivered the Subject Vehicle to an authorized NISSAN NORTH AMERICA, INC.  repair facility for repair of the nonconformities.

88.    Defendant was unable to conform the Subject Vehicle to the applicable express warranty after a reasonable number of repair attempts.

89.    Notwithstanding Plaintiff's entitlement, Defendant NISSAN NORTH AMERICA, INC.  has failed to either promptly replace the new motor vehicle or to promptly make restitution in accordance with the Song-Beverly Act.

90.    By failure of Defendant to remedy the defects as alleged above, or to issue a refund or replacement vehicle, Defendant is in breach of its obligations under the Song-Beverly Act.

91.     Under the Act, Plaintiff is entitled to reimbursement of the price paid for the Subject Vehicle, less that amount directly attributable to use by the Plaintiff prior to the first presentation of the nonconformities.

92.     Plaintiff is entitled to all incidental, consequential, and general damages resulting from Defendant's failure to comply with its obligations under the Song-Beverly Act.

93.     Plaintiff is entitled under the Song-Beverly Act to recover as part of the judgment a sum equal to the aggregate amount of costs and expenses, including attorney's fees, reasonably incurred in connection with the commencement and prosecution of this action.

94.     Because Defendant willfully violated the Song-Beverly Act, Plaintiff is entitled in addition to the amounts recovered, a civil penalty of up to two times the amount of actual damages for NISSAN NORTH AMERICA, INC.'s willful failure to comply with its responsibilities under the Act.

## SECOND CAUSE OF ACTION

### Violation of the Song-Beverly Act – Breach of Implied Warranty

95.     Plaintiff incorporates herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

96.     NISSAN NORTH AMERICA, INC. and its authorized dealership at which Plaintiff purchased the Subject Vehicle had reason to know the purpose of the Subject Vehicle at the time of sale of the Subject Vehicle.  The sale of the Subject Vehicle was accompanied by implied warranties provided for under the law.

97.     Among other warranties, the sale of the Subject Vehicle was accompanied by an implied warranty that the Subject Vehicle was merchantable pursuant to Civil Code section 1792.

98.     The Subject Vehicle was not fit for the ordinary purpose for which such goods are used because it was equipped with one or more defective vehicle

systems/components.

99.   The Subject Vehicle did not measure up to the promises or facts stated on the container or label because it was equipped with one or more defective vehicle systems/components.

100.   The Subject Vehicle was not of the same quality as those generally accepted in the trade because it was sold with one or more defective vehicle systems/components which manifested as electrical, structural, engine, transmission, and emission system defects.

101.   Upon information and belief, the defective vehicle systems and components were present at the time of sale of the Subject Vehicle; thus, extending the duration of any implied warranty under *Mexia v. Rinker Boat Co., Inc.,* 174 Cal. App. 4th 1297, 1304–1305 (2009), and other applicable laws.

102.   Plaintiff is entitled to justifiably revoke acceptance of the Subject Vehicle under Civil Code, section 1794, *et seq*.

103.   Plaintiff hereby revokes acceptance of the Subject Vehicle.

104.   Plaintiff is entitled to replacement or reimbursement pursuant to Civil Code, section 1794, *et seq*.

105.   Plaintiff is entitled to rescission of the contract pursuant to Civil Code, section 1794, *et seq*. and Commercial Code, section 2711.

106.   Plaintiff is entitled to recover any incidental, consequential, and/or "cover" damages under Commercial Code, sections 2711, 2712, and Civil Code, section 1794, *et seq*.

### **THIRD CAUSE OF ACTION**

### **Violation of the Song-Beverly Act Section 1793.2(b)**

107.   Plaintiff incorporates herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

108.   Pursuant to Civil Code, section 1793.2, subdivision (a), a manufacturer

that sells consumer goods in California, for which it has made an express warranty, shall maintain service and repair facilities or designate and authorize independent service and repair facilities to carry out the terms of those warranties.

109. Pursuant to Civil Code, section 1793.2, subdivision (b), when service and repair of goods are necessary because they do not conform with the applicable express warranties, service and repair shall be commenced within a reasonable time by the manufacturer or its representative.

110. Civil Code, section 1793.2, subdivision (b), further provides that goods shall be serviced or repaired so as to conform to the applicable warranties within 30 days and/or within a reasonable time.

111. The sale of the Subject Vehicle was accompanied by express warranties, including a warranty guaranteeing that the Subject Vehicle was safe to drive and not equipped with defective parts, including that of the suspension, electrical, transmission, steering, and engine systems.

112. Plaintiff delivered the Subject Vehicle to NISSAN NORTH AMERICA, INC.'s authorized service representatives on multiple occasions for repairs of defects, which amount to nonconformities to the express warranties that accompanied the sale of the Subject Vehicle.

113. Defendant's authorized facilities did not conform the Subject Vehicle to warranty within 30-days and/or commence repairs within a reasonable time, and NISSAN NORTH AMERICA, INC. has failed to tender the Subject Vehicle back to Plaintiff in conformance with its warranties within the timeframes set forth in Civil Code section 1793.2(b).

114. Plaintiff is entitled to justifiably revoke acceptance of the Subject Vehicle under Civil Code, section 1794, *et seq.*

115. Plaintiff hereby revokes acceptance of the Subject Vehicle.

116. Plaintiff is entitled to replacement or reimbursement pursuant to Civil Code, section 1794, *et seq.*

117.   Plaintiff is entitled to rescission of the contract pursuant to Civil Code section 1794, *et seq.* and Commercial Code, section 2711.

118.   Plaintiff is entitled to recover any "cover" damages under Commercial Code sections 2711, 2712, and Civil Code, section 1794, *et seq.*

119.   Plaintiff is entitled to recover all incidental and consequential damages pursuant to 1794 *et seq* and Commercial Code sections, 2711, 2712, and 2713 *et seq.*

120.   Plaintiff is entitled in addition to the amounts recovered, a civil penalty of up to two times the amount of actual damages given that NISSAN NORTH AMERICA, INC. willfully failed to comply with its responsibilities under the Act.

## FOURTH CAUSE OF ACTION

### Fraud - Fraudulent Inducement – Concealment

121.   Plaintiff incorporates herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

122.   NISSAN NORTH AMERICA, INC. intentionally and knowingly falsely concealed, suppressed, and/or omitted material facts including the standard, quality or grade of the Subject Vehicle and the fact that the FEB system in the Subject Vehicle is defective, exposing drivers, occupants, and members of the public to safety risks with the intent that Plaintiff rely on NISSAN NORTH AMERICA, INC.'s omissions. As a direct result of Defendants' fraudulent conduct, Plaintiff has suffered actual damages.

123.   In its quest to be commercially competitive, NISSAN NORTH AMERICA, INC. designed, tested, validated, marketed, and sold its Forward Emergency Braking system ("FEB") that is featured in the Subject Vehicle. According to NISSAN NORTH AMERICA, INC. itself:

> [T]his intelligent feature uses radar technology to monitor a vehicle's proximity to the vehicle ahead, giving the driver audible and visual display warnings to help the driver reduce the vehicle's speed if a potential frontal collision is detected. If

the driver fails to respond, the [Forward Emergency Braking] system can apply the brakes, helping the driver to avoid the collision or reduce the speed of impact if it is unavoidable.[8]

124.    As a result of NISSAN NORTH AMERICA, INC.'s failure to disclose to Plaintiff the material fact that the FEB system in the Subject Vehicle is defective, Plaintiff is required to spend thousands of dollars to repair or replace the FEB Defect or sell the vehicle at a substantial loss. The fact that the FEB system in the Subject Vehicle is defective is material because no reasonable consumer expects that he or them will have to spend thousands of dollars for diagnosis, repair, or replacement of the FEB Defect, and because Plaintiff has a reasonable expectation that the vehicles would not suffer from the FEB Defect.

125.    The fact that the FEB system installed in the Subject Vehicle is defective is also material because it presents a safety risk and places the driver and occupants at risk of serious injury or death. Because of the FEB Defect, the Subject Vehicle may suddenly brake automatically while driving in traffic. Drivers and occupants of the Subject Vehicle are at risk for rear-end collisions and other accidents caused by the FEB Defect, and the general public is also at risk for being involved in an accident with a Subject Vehicle. Plaintiff would not have purchased the Subject Vehicle but for NISSAN NORTH AMERICA, INC.'s omissions and concealment of material facts regarding the nature and quality of the Subject Vehicle and existence of the FEB Defect, or would have paid less for the Subject Vehicle.

126.    NISSAN NORTH AMERICA, INC. knew that its concealment and suppression of material facts was false and misleading and knew the effect of concealing those material facts. NISSAN NORTH AMERICA, INC. knew that its concealment and suppression of the FEB Defect would sell more vehicles.

127.    Despite notice of the FEB Defect from, among other things, pre-

---

[8] The Confidence of Nissan Safety Technology, Nissan Safety Features & Technologies (Dec. 16, 2019),https://www.nissanusa.com/experience-nissan/news-and-events/car-safetyfeaturestechnology.html (last visited May 7, 2020).

production testing, numerous consumer complaints, warranty data, and dealership repair orders, NISSAN NORTH AMERICA, INC. has not recalled the Subject Vehicle to repair the Defect, has not offered its customers a suitable repair or replacement free of charge, and has not offered to reimburse Plaintiff for the costs incurred relating to diagnosing and repairing the FEB Defect or for the premium price that paid for the FEB feature.

128.   At minimum, NISSAN NORTH AMERICA, INC. knew about the FEB Defect by way of customer complaints filed with affiliated dealerships and through the NHTSA, as extensively documented above. As such, NISSAN NORTH AMERICA, INC. acted with malice, oppression, and fraud. Plaintiff reasonably relied upon Defendants' knowing, affirmative and active false representations, concealment, and omissions. As a direct and proximate result of NISSAN NORTH AMERICA, INC. false representations, omissions, and active concealment of material facts regarding the FEB Defect, Plaintiff has suffered actual damages in an amount to be determined at trial.

129. NISSAN NORTH AMERICA, INC. and its agents intentionally concealed and failed to disclose facts relating to the Automatic Emergency Braking and Forward Collision Warning Systems Defect.

130.   Defendant was the only party with knowledge of the Automatic Emergency Braking and Forward Collision Warning Systems Defect because that knowledge came from internal reports such as pre-release testing data, customer complaints made directly to Defendant, and technical service bulletins.  None of this information was available to the public, nor did Defendant publicly or privately disclose any of the information to Plaintiff. NISSAN NORTH AMERICA, INC. had exclusive knowledge of the defect as described in detail hereinabove.

131.   NISSAN NORTH AMERICA, INC. actively concealed information from the public, preventing Plaintiff from discovering any of the concealed facts as described in detail hereinabove.

132.   Further, NISSAN NORTH AMERICA, INC. has learned more about the Automatic Emergency Braking and Forward Collision Warning Systems Defect and has intentionally concealed and suppressed that information; Nissan has failed to recall the effected vehicles or otherwise inform Plaintiff of the Automatic Emergency Braking and Forward Collision Warning Systems Defect.

133.   Prior to the date of sale, on the date of sale, and on the date of each of the repair attempts, NISSAN NORTH AMERICA, INC. had an opportunity to disclose the Automatic Emergency Braking and Forward Collision Warning Systems Defect to Plaintiff, but instead concealed from and failed to disclose to Plaintiff, any of the known irreparable issues with the Subject Vehicle.

134.   NISSAN NORTH AMERICA, INC. intended to deceive Plaintiff by concealing the known issues with the Automatic Emergency Braking and Forward Collision Warning Systems Defect in an effort to sell the Subject Vehicle at a maximum price.

135.   NISSAN NORTH AMERICA, INC. knew of the specific issues affecting the Subject Vehicle, including the defective Automatic Emergency Braking and Forward Collision Warning Systems Defect, prior to the sale of the Subject Vehicle. Plaintiff's Vehicle was sold after NISSAN NORTH AMERICA, INC. acknowledged these problems in Automatic Emergency Braking and Forward Collision Warning Systems Defect without any disclosure to Plaintiff regarding the same. When Plaintiff experienced repeated problems with the Automatic Emergency Braking and Forward Collision Warning Systems Defect in the Subject Vehicle and delivered it to NISSAN NORTH AMERICA, INC's authorized repair facility for evaluation and repair, NISSAN NORTH AMERICA, INC. and its agents continued to conceal the known Automatic Emergency Braking and Forward Collision Warning Systems Defect and repeatedly represented to Plaintiff that they were able to, and did fix the issue.

136.   Plaintiff did not know about the Automatic Emergency Braking and

Forward Collision Warning Systems Defect at the time of the vehicle's sale. Plaintiff also did not know of the irreparable nature of the problems at the time of any of the repair attempts because NISSAN NORTH AMERICA, INC. and its agents repeatedly represented that they were able to fix the Subject Vehicle upon return of the vehicle to Plaintiff.

137.   Had NISSAN NORTH AMERICA, INC. and/or its agents publicly or privately disclosed the Automatic Emergency Braking and Forward Collision Warning Systems Defect to Plaintiff at or prior to the sale, Plaintiff would not have purchased the Subject Vehicle.

138.   Plaintiff was harmed by Defendant's concealment of the Automatic Emergency Braking and Forward Collision Warning Systems Defect because Plaintiff was induced to enter into the sale of a vehicle that he would not have otherwise purchased.

139.   Plaintiff is a reasonable consumer who interacted with NISSAN NORTH AMERICA, INC.'s sales representatives and/or reviewed materials distributed by Defendant concerning Nissan vehicles prior to Plaintiff's purchase of the Subject Vehicle. Plaintiff would have been aware of the Automatic Emergency Braking and Forward Collision Warning Systems Defect and would not have leased and/or purchased the Subject Vehicle if Defendant had disclosed the Emergency Brake Defect and its associated safety hazards to its sales representatives and/or the consumer public.

140.   Defendant's concealment of these defects was a substantial factor in causing Plaintiff's harm.

///

///

///

///

///

# **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendant, as follows:

1. For general, special, and actual damages according to proof at trial;

2. For rescission of the purchase contract and restitution of all monies expended;

3. For diminution in value;

4. For incidental and consequential damages according to proof at trial;

5. For civil penalty in the amount of two times Plaintiff's actual damages;

6. For punitive damages;

7. For prejudgment interest at the legal rate;

8. For reasonable attorney's fees and costs of suit; and

For such other and further relief as the Court deems just and proper under the circumstances.

Dated:   August 30, 2022

                              **QUILL & ARROW, LLP**

                              *Kevin Y. Jacobson*

                              Kevin Y. Jacobson, Esq.
                              Aaron Cohen, Esq.
                              Attorneys for Plaintiff,
                              **BEVERLY LUZ COLEMAN**

Plaintiff, BEVERLY LUZ COLEMAN, hereby demands trial by jury in this action.